IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

MICHAEL ANDERSON; LOUIS     *
RICHARD ROWLAND; and     *
MICHAEL DOBSON,     *
    *
       Plaintiffs,     *
    *
vs.     *     No. 4:98cv0070 SWW
    *
    *
    *
THE BOARD OF EDUCATION OF     *
PULASKI COUNTY SCHOOL     *
DISTRICT, a Public Body Corporate,     *
    *
       Defendant.     *

## MEMORANDUM AND ORDER

This is a case of alleged race discrimination in employment and is brought pursuant to 42

U.S.C. §§ 2000e *et seq.* ("Title VII") and 42 U.S.C. § 1981.  The matter was tried to the Court on

February 22, 23, 24 and 25, and November 21, 2005 and  concluded on the morning of

November 22, 2005.  This Memorandum and Order constitutes the Court's findings of fact and

conclusions of law as required by Fed.R.Civ.P. 52.[1]

---

[1] This action was filed on February 3, 1998.  Following normal pretrial proceedings, including the denial in large part of defendant's motion for summary judgment, this Court, on October 23, 2000, removed this action from the docket at the joint request of the parties so that mediation could be pursued.  Nearly four years later, on July 23, 2004, the action was reinstated to the docket at the request of plaintiffs upon being notified that mediation had failed.  It is not clear why the mediation process consumed nearly four years.  Apparently, the individual selected to conduct mediation became ill, but the parties do not indicate whether another mediator was sought.  In any case, the matter was tried to the Court the week of February 22, 2005, but had to be continued to the following November as the parties were unable to conclude the trial during the week in February for which it was scheduled to be tried and there was a previously scheduled jury trial the following week.  Tr. at 430.  Following the conclusion of the trial on November 22, 2005, this Court directed that post-trial briefs be filed.  Upon filing of the briefs, counsel for plaintiffs requested additional time in which to file a response to defendant's submissions.  Ultimately, however, by letter dated January 26, 2006, nearly eight years to the day this action was filed, counsel for plaintiffs notified this Court that the matter was ripe for decision and that no further pleadings would be filed.

I.

The plaintiffs in this action, all of whom are African American, are former employees of the defendant, the Pulaski County Special School District ("district").  Plaintiffs allege discriminatory actions on the part of the district with respect to the terms and conditions of their employment.  *See generally* Plaintiffs' Proposed Findings of Fact and Conclusions of Law ("PFFCL") [doc.#70].[2]

Plaintiff Michael Anderson claims he was treated differently than similarly situated white persons employed by the defendant with respect to pay.  He claims that upon his employment with defendant, he was lead to believe that his pay was and would be consistent with other similarly situated persons with his level of qualifications and who occupied the same grade on the pay scale, but that his pay was below that of similarly situated persons, while his job responsibilities, at least in reference to certain individuals, were greater.

Plaintiff Louis Richard Rowland likewise claims he was consistently been paid lower wages than similarly situated white persons and that he was denied pay increases while white employees were provided such increases.  Rowland further claims that he was discriminated against when he was not selected for promotion to the position of General Maintenance Supervisor.

Plaintiff Michael Dobson also claims he was paid lower wages than similarly situated white persons and denied promotions, and that he was subjected to racial terms, written racial

---

[2] It can be fairly said that plaintiffs' claims have never been stated with the greatest of precision, thus leading to a less than concise presentation at trial.  In this respect, following trial, plaintiffs filed a motion to amend to conform to the proof pursuant to Fed.R.Civ.P. 15(b).  This Court denied plaintiffs' motion by Order dated December 15, 2005 [doc.#64], as plaintiffs failed to point to any evidence to which any proposed amended pleadings were to be conformed and their failure to specify how they proposed to amend the pleadings.  Subsequently, on January 13, 2006, plaintiffs filed their PFFCL, which represents their only post-trial statement and analysis of their claims.  *See* n.1, *supra*.  Accordingly, this Court has considered plaintiffs' PFFCL, among other things, in delineating plaintiffs' claims.

2

epithets on his office door, verbal abuse, and intolerable office facilities.  He claims he was ultimately forced to resign his position with the district because of these conditions and that this constituted a constructive discharge.

1. <u>Michael Anderson</u>

Anderson commenced employment with the district in March 1996 as Coordinator of Security.  According to his resume, Anderson had a B.S. in Criminal Justice Administration, an A.S. in Criminal Justice Administration, and an A.S. in Security Administration.  Pl.s' Ex. 1.  Anderson had significant military experience and he had some but not extensive supervisory experience.  *Id.*

Anderson was interviewed and selected by a biracial committee from a number of applicants for the position of Coordinator of Security.  Tr. at 580.  Anderson's annual salary upon his employment with the district was $29,443.68, at Grade 9 on the salary scale.  Pl.s' Ex. 51.  Effective July 1, 1997, Anderson's employment was upgraded to the position of Director of Security/Safety in the District's Support Services division and his annual salary was increased to the sum of $33,200.34, at Grade 12 on the salary scale.  *Id.*; Pl.'s Ex. 4.  As Director of Security/Safety, Anderson oversaw an annual budget of $308,000 and supervised eight employees.  Pl.s' Ex. 51.  The Director of Security/Safety was not required to hold a teaching certificate or any type of specialized degree or certification.  *Id.*

When Anderson was promoted, Ed Hogan, Assistant Superintendent of Support Services, recommended to Gary Miller, Assistant Superintendent of Personnel, that because the demands on this position have become "enormous," that this position be paid at a range of 16 on the salary

schedule.  Pl.s' Ex. 2.  That same day, a staff meeting was held to discuss the issue following

which it was determined Anderson's salary would be at Grade 12.  Def.'s Ex. 17.  Anderson was

dissatisfied with this salary, contending it should have been Grade 16.  Pl.'s Ex. 4.

On September 5, 1997, Anderson notified Hogan that he would like to invoke the formal

grievance process regarding "the inconsistences [sic] and inequitableness of my financial

compensation."  Def.s' Ex. 19.  On October 7, 1997, Bobby Lester, Superintendent of the

district, denied Anderson's grievance, concluding that he did not present any evidence to refute a

compensation analysis that was conducted or any evidence to support a rationale that was

discussed in a previous informal meeting.  Def.'s Ex. 28.  Anderson subsequently requested a

hearing before the Board of Education to appeal Lester's decision, and on October 14, 1997, the

Board voted 4 to 3 to uphold Lester's decision.  Def.'s Ex. 30.

On October 16, 1997, two days after the Board hearing, Anderson filed a charge of

discrimination with the Equal Employment Opportunity Commission ("EEOC") in which he

stated that the reason given to him for being placed at a Grade 12 rather than Grade 16 when he

was promoted "was that I had only been with the district for one year," and that "I believe that I

am being paid less wages because of my race, black, in violation of Title VII ...."  Def.'s Ex. 70.

Anderson left the employment of the district on October 1, 2001.


2. Louis Richard Rowland

Rowland commenced employment with the district in August 1989 as a certified teacher.

According to his resume, Rowland had a B.S. in Industrial Education and had completed about

half of the course work towards a M.S. degree in management.  Pl.s' Ex. 30; Tr. at 401.  In 1991-

4

92, Rowland sought and was selected as a Coordinator in the maintenance department.  Tr. at 403; Pl.s' PFFCL at 8.

Ultimately, however, Rowland was laid off as Coordinator due to budget cuts in the district and he was downgraded to a lesser position with lesser pay.  Tr. at 404.  In this respect, Rowland was doing general maintenance work when the individual to whom he reported, Billy Cheeks, General Maintenance Supervisor, retired and suggested Rowland as a replacement.  Tr. at 407-08.  Rowland applied for the position but he states than a white individual named Cecil Moore was offered the position instead.  *Id.* at 420-22.  Rowland states he learned that Moore informed the district that he had to have a salary of $38,000 and that if they couldn't provide such a salary, "they could keep their job."  *Id.* at 424.  Rowland states that Moore initially accepted the position but then declined it.  *Id*. at 421-22.

However, according to a Memo dated March 14, 1997, Rowland, along with six other individuals, including one named Raymond Moore, were interviewed by a biracial committee for the position of General Maintenance Supervisor and Rowland was recommended for the position over Moore and the others.  Def.'s Ex. 52.  Rowland, stating that the only one that offered him the position was Richard Wilkerson, Director of School Plant Services, does not dispute that he was interviewed for the position by a biracial committee but simply states that he doesn't recall it.  Tr. at 445.  Further, Rowland does not specifically dispute that the Raymond Moore who was interviewed for the position along with himself could have been the Moore he claims initially was offered but declined the position, stating only that he was told his first name was Cecil.  Tr. at 446.  Rowland acknowledges that he has no firsthand knowledge of what happened in any discussions between anybody at the district and Moore.  Tr. at 446.  In any case, on March 20,

1997, Rowland was promoted to the position of General Maintenance Supervisor at a salary of $29,235.40, a 35.3 percent increase in pay.  Tr. at 871; Def.'s Ex. 51.  Rowland, however, states he was told that he would be paid $33,000 per year.  Tr. at 421-22.

On October 31, 1997, Rowland filed a charge of discrimination with the EEOC in which he stated that on March 20, 1997, he was promoted to the position of General Maintenance Supervisor and was told that he would be paid $33,000 per year.  He also stated he was told that a white applicant was offered $38,000 per year for the position but that he declined the position.  Rowland stated that he was only paid $29,000 per year, which was near the bottom of his pay scale, and that on September 15, 1997, he asked his supervisor that he be upgraded to $33,333 per year but that his request was denied.  Rowland stated that he believes he was discriminated against because of his race, black, in violation of Title VII because "white employees hired after me were hired in at the top of their pay scale."  Def.'s Ex. 71.  Rowland retired with the district at the end of the 2002-2003 school term as a support staff member.


3. Michael Dobson

Dobson commenced employment with the district in September 1993 as a computer technician.  Tr. at 79, 89; Def.'s Ex. 35.  According to his resume, Dobson had an A.S. in Engineering Technology that he received in 1985 from Arkansas College of Technology and had taken course work from the University of Arkansas at Little Rock.  Pl.s' Ex. 23; Def.'s Ex. 33; Tr. at 26.[3]  Dobson's salary upon his employment was set at Grade 5 on the salary scale.  Def.'s Ex. 35.

---

[3] There are two versions of Dobson's resume in the record.

At the time of Dobson's hire, the district was in the process of purchasing numerous computers.  Tr. at 80.  Dobson's first supervisor was Dr. Bobby Altom, Assistant Superintendent of Learning Services, which at the time was termed Instructional division.  Tr. at 29, 77-78. Dobson was the only computer technician in the Instructional division during the time he worked there; all of the other computer and repair service technicians of which he was aware worked in Management Information Systems ("MIS") under the Business Affairs division.  Tr. at 78-79. Dobson's office when he was first hired was at the Pulaski East complex in what Dobson claimed was "like a small closet."  Tr. at 29, 91.  This office had a workbench and an area to store his tools.  Tr. at 91.

After about a year, Dobson's supervision changed and he went to work for Dr. Kay Bland, Director of Libraries and Informational Technologies.  Tr. at 29, 108, 1212.  In conjunction with this move, Dobson was placed in a bigger office in an area on the outer parameters of the Pulaski East complex that Dobson states was separated from the other employees.  Tr. at 29-30, 108.  Dobson states this office was hot in the summer and cold in the winter (with the heat not working) and that he had to sometimes do work in his car as a result. Tr. at 37-39.  He states that the office was not properly ventilated, that there were holes in the windows and a hole in the wall, and that "there was a couple of occasions where there was a snake – there were snakes in my office.  I say snakes, because the two that I saw were two different colors.  Lizards, centipedes."  Tr. at 38.  In this respect, Dobson stated there were snakes in this office "with no shoulders" that were "slithering on the floor," and that he killed a snake on one occasion.  Tr. at 107.  Dobson states he told Dr. Bland and, possibly, Ed Hogan, about the snakes but he doesn't recall when, stating he "didn't look at a calendar when I killed

the snake." Tr. at 107, 1160.

Dobson further states this office sat in the same area where there was a hog pen and that there were periodically hogs at the office door. Tr. at 38.[4] He states that some of the hogs frequented the area to the extent that he gave three of them names. Tr. at 38. Dobson states there was a foul odor associated with the hogs, and that there was the smell of raw sewage from a rest room that was operating some of the time in that work area. Tr. at 44. Dobson further states that there were drainage problems such that his office was not accessible until he dug a drainage ditch to create a runoff, and that some of this runoff included raw sewage that contained "some form of feces." Tr. at 42, 44.[5]

There was also a racial epithet painted on the door to Dobson's office that said something like, "Nigger, go home" or "Nigger, get out. Go away. We don't want you niggers here. We don't want, nigger, you here." Tr. at 22, 40, 108; Pl.s' Ex. 25. Dobson states this writing had been on his wall for several months while he was at the office and that a district employee or other individual who apparently was making some type of service call for the district "brought it to my attention." Tr. at 41, 109; Pl.s' Ex. 25. Apparently, the writing was "some felt-tip writing that was bleeding through the paint that was on the door," paint that had previously been applied over the writing. Tr. at 1124. Dobson never made any written complaint about this writing, however, and he only told Ree Fitzpatrick, Director of Support Staff, about the matter after he moved out of the office. Tr. at 110-11. As soon as Fitzpatrick found out about the door, he went with Dobson to the office. Tr. at 111. Fitzpatrick, also an African-American, states he could not

---

[4] The hog pen at issue was not on district property and was owned by third parties. Tr. at 1125.

[5] This is not to imply that Dobson spent the majority of his time in his office; rather, part of Dobson's duties were to service computers in the schools throughout the district. Tr. at 1217-18.

make out what was written but that he in any case directed that the maintenance custodian paint the door.  Tr. at 1125; Pl.s' PFFCL at 17.  Dobson states he does not know what Fitzpatrick did about the door, but he does acknowledge that the door was painted.  Tr. at 111.

It was also at the time he was at this location that Dobson states he was subjected to cursing from Judy Brady, coordinator for business and marketing teachers, and Beverly Williams, mathematics curriculum coordinator (neither of whom supervised Dobson).  Tr. at 31, 113, 924-26, 951, 955.  Dobson essentially states that on one occasion, Brady's utterances, "[b]eyond the "damns" and "goddamns," included "fucking shits" and that "there would be a goddamn come-to-Jesus meeting."  Tr. at 33, 36, 114.  Dobson states he "was kind of – I was really kind of irritated."  Tr. at 33.  Dobson states Williams told him at one point, "Working on the computers is not good enough.  I want those goddamn monitors fixed, and I want them fixed and back in the goddamn classroom of Fuller Junior High by Friday."  Tr. at 115.

Dobson states that after about a year under Dr. Bland (Dr. Bland states it was approximately two years, '94-'95, '95-'96), his supervision changed and he went to work for Ed Hogan.  Tr. at 30, 1214, 1230.[6]  This change in supervision to Hogan apparently occurred on or about January 27, 1997 and was signed off on February 4, 1997, when Dobson transferred to the maintenance department as a computer repairman, although Dobson later stated he was in the maintenance department as of January 14, 1997.  Tr. at 89-90, 144, 149; Def.'s Ex. 35, 37.  In any case, Dobson states that Hogan was in the process of preparing a work area for him and that Hogan, along with Dr. Bland and another individual he cannot recall, interviewed him for the position of Assistant Director of Technology Support with the result being that Hogan offered

---

[6] Dobson later stated he reported to Dr. Bland up until the latter portion of 1996.  Tr. at 108.

him the job in December 1996 or early January 1997.  Tr. at 52, 83, 100, 131 143, 145.  Dobson

did not have a copy of a posting for any such position, which he acknowledged was required by

the district, and he did not fill out any documents and had no memos, district forms, his own

notations, etc. relevant to such position.  Tr. at 84, 101, 151.  For his part, Hogan denies ever

offering Dobson this position and states he came into contact with Dobson for only a brief period

of time and did not remember very much at all about him as he was only in his division for

something like two to three months.  Tr. at 1166-67.  Likewise, Dr. Bland denied offering

Dobson the position, stating that would not have been within her supervisory duties.  Tr. at 1220.

On May 1, 1997, Dobson transferred to MIS in the Business Affairs division where he

worked as a computer service technician under Laura McBeth, MIS Director.  Tr. at 53, 90, 112,

152; Def.'s Ex. 35.  Dobson received training upon his transfer into MIS and his workload

diminished.  Tr. at 155-56.  Dobson was placed in what was formerly a "smoking room" that had

the "stench of smoke," or a "pretty intense" smell of smoke.  Tr. at 55-56, 112, 205, 208.

Dobson states that the room made him physically ill, and that his symptoms included vomiting.

Tr. at 32, 63, 153.  Dobson did not know if there were other offices available and he did not

know if any other employees were placed in that office.  Tr. at 112.  In fact, two white

individuals that followed Dobson – Hal Winter and Mike Cothren – likewise were placed in the

smoke room due to space shortage.  Tr. at 205-206, 391, 1023.  In any case, Dobson states that

being placed in the "smoke room" was the "straw ... that broke the back" in terms of causing him

to leave the employ of the district when he did.  Tr. at 63.

On June 11, 1997, Dobson informed Ree Fitzpatrick that he was requesting to be

considered for the position of Assistant Director of Technology Support.  Def.'s Ex. 39; Tr. at

10

117.  The closing date for this position was the following day, June 12, 1997.  Def.'s Ex. 29.

Two white individuals, Jimmy Hogg and Kelly Sneed, applied for the position as well.  Tr. at

215.  Dobson states that this position was "tailor-made" around Sneed's qualifications and did

not reflect his own qualifications.  Tr. at 67-68.  In any case, twelve days later, on June 23, 1997,

before interviews for the position took place, Dobson informed Gary Miller and Laura McBeth

that he was resigning his position with the district effective July 9, 1997.  Def.'s Ex. 40; Tr. at

119.  The next day, Dobson took another job, without a loss of pay, with Mount St. Mary

Academy.  Tr. at 119, 157.  On August 4, 1997, a biracial committee recommended Jimmy Hogg

for the position of Assistant Director of Technology Support.  Tr. at 217; Def.'s Ex. 47.

On December 9, 1997, Dobson filed a charge of discrimination with the EEOC in which

he stated that during his employment with the district, he "was subjected to different terms and

conditions of employment in training, promotions, and promotional opportunities," and "was

subjected to verbal abuse and racial comments written on a office door area."  He stated that on

July 1, 1997, he "was forced to resign my position due to the difference in treatment between

white individuals in similar circumstances," and that "I believe I have been discriminated against

because of my race, black, in violation of Title VII ...."  Def.'s Ex. 72.

## II.

The analysis applicable to Title VII disparate treatment and § 1981 claims in employment

discrimination cases is the familiar three-part framework initially set out in *McDonnell Douglas

Corp. v. Green*, 411 U.S. 792 (1973).  *See Davis v. KARK-TV, Inc.*, 421 F.3d 699, 703-04 (8th

Cir. 2005) (citations omitted).  Under the *McDonnell Douglas* framework, a presumption of

discrimination is created when the plaintiff meets his burden of establishing a prima facie case. *Id.* A minimal evidentiary showing will satisfy this burden of production. *Id.* Once a plaintiff successfully establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. *Id.* If the employer meets its burden, the presumption of discrimination disappears requiring the plaintiff to prove that the employer's articulated reason was in fact not the true reason for the employment decision and a pretext for discrimination. *Id.* The plaintiff has the burden of persuasion at all times. *Id.*[7]

## 1.

The Court first addresses the salary discrimination claims of Anderson, Rowland, and Dobson. In order to establish a prima facie case of salary discrimination under Title VII and § 1981, plaintiffs must show that the district paid different wages to employees of different races for "equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Tadme v. Saint Cloud State University*, 328 F.3d 982, 989 (8th Cir. 2003) (quoting *Sowell v. Alumina Ceramics, Inc.*, 251 F.3d 678, 682 (8th Cir. 2001)). Determining whether two jobs require equal skill, effort, or responsibility requires a practical judgment of all relevant facts and circumstances. *Id.* (citing *Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 719 (8th Cir. 2000), *cert. denied*, 531 U.S. 1077 (2001)). Requisite skill is measured by such factors as education, training, experience, and

---

[7] Plaintiffs also referenced in their amended complaint a claim under the Fourteenth Amendment to the Constitution of the United States. No such claim was referenced in the parties' post-trial briefs or PFFCL, however. That being so, and as the issue of discriminatory intent is in any case common to analysis under the Fourteenth Amendment and Title VII (and 42 U.S.C. § 1981), *see Craik v. Minnesota St. Univ. Bd.*, 731 F.2d 465, 469 n.5 (8th Cir. 1984) (citing *Washington v. Davis*, 426 U.S. 229, 240 (1976)), this Court will confine its discussion to Title VII and § 1981.

ability.  *Id.*

a.

Anderson compares himself with  four white individuals for purposes of his salary

discrimination claim: Michael Harvey, Barton Hunter, Jerry Holder, and Richard Wilkerson.  Tr.

at 322.  Anderson's reliance on these individuals is misplaced as they oversaw much larger

budgets, supervised substantially more employees, and/or the positions they held required

minimum qualifications that exceeded those required for Anderson's position.  Specifically,

Michael Harvey, whose annual pay was set at Grade 16 on the salary scale, was the district's

Director of Food Services with budgetary responsibility of approximately $5 million and

supervisory responsibility over some 300 employees.  Pl.s' Ex. 51.  Similarly, Barton Hunter,

whose annual pay was set at Grade 17 on the salary scale, was the district's Director of

Transportation for the district, oversaw an annual budget of around $8.2 million, and was

responsible for supervising approximately 330 employees.  Pl.s' Ex. 51.  Richard Wilkerson,

whose annual pay was set at a comparable Grade of 17 on the salary scale and was, as previously

noted, the district's Director of School Plant Services, oversaw an annual budget of

approximately $10 million and supervised around 68 employees.  Pl.s' Ex. 51.  In addition, one

of the minimum qualifications for Wilkerson's position was a valid Arkansas teaching

certificate.  Def.s' Ex. 26; Pl.s' Ex. 51.   In contrast, Anderson oversaw an annual budget of

$308,000 and supervised eight employees and he was not required to hold a teaching certificate

or any type of specialized degree or certification.  Pl.s' Ex. 51.

It is true that Jerry Holder, the district's Director of Plant Planning Services whose

13

annual pay was set at Grade 18 on the salary scale, only managed a budget of approximately $225,000 and supervised four employees (compared with Anderson's overseeing an annual budget of $308,000 and supervision of eight employees).  Pl.s' Ex. 51.  One of the minimum qualifications for the position, however, was an engineering degree.  Pl.'s Ex. 51.  In this respect, due to the technical nature of this position and the need for the person employed in that position to have an engineering degree, the position was established at Grade 18.  Pl.s' Ex. 51; Def.'s Ex. 25.  Thus, the minimum qualifications for the position were significantly higher than for Anderson's.

To the extent Anderson also compares his salary to that of two white employees in the district's Management Information Systems ("MIS") Division, Jimmy Hogg and Mike Cothren, his reliance on these individuals is similarly misplaced.  Anderson states he is comparing himself to Hogg and Cothren "[o]nly in reference to show where those guys come in the district and they paid them 21, 20 steps up the scale respectively, versus me having to start at the bottom of the scale."  Tr. at 322.  Regardless, Anderson acknowledged that he was not "knowledgeable at all" about Hogg's or Cothren's experience, qualifications, and job certifications, and he acknowledged that these individuals worked in a completely different division and reported to different supervisors.  *Id.* at 322-23.  In fact, Hogg was a certified Novell engineer with extensive experience in operating systems and network management, while Cothren likewise had extensive computer experience, including Novell training, and significant administrative experience.  Def.'s Ex. 48, 49; Pl.s' Ex. 1; Tr. at 372, 380-81, 387-90.  Anderson further acknowledged that he had "very limited" knowledge of the salary ranges for the people who work in the jobs that Hogg and Cothren work.  Tr. at 323-24.  Again, Anderson simply did not

14

have the experience and qualifications of Hogg and Cothren and his reliance on these individuals for comparison is misplaced.

In sum, the individuals to whom Anderson compares himself oversaw much larger budgets, supervised substantially more employees, and/or the positions they held required minimum qualifications that exceeded those required for Anderson's position.   Anderson has not demonstrated that the district paid different wages to these individuals for "equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Tadme*, 328 F.3d at 989.


b.

Rowland states he is comparing himself to Cecil (or Raymond) Moore and Billy Cheeks for purposes of his salary discrimination claim, Pl.s' PFFCL at 11-12, although he stated at trial that he is comparing himself to Mike Copeland.  Tr. at 460.  In his amended complaint, Rowland states he is comparing himself to Tom Camp, Electrical Systems Supervisor, and Calvin Brown, Mechanical Systems Supervisor.  Am. Compl. at ¶ 12(j).  Regardless, Rowland's reliance on these individuals for comparison is misplaced.

With respect to Cecil (or Raymond) Moore, Rowland claims that when he was hired for the position of General Maintenance Supervisor, he was given an annual salary of $29,000, but that Moore was offered an annual salary of $38,000 for the position.  The record shows, however, and Rowland does not specifically dispute, that he, along with six other individuals including Moore, were interviewed by a biracial committee for the position of General Maintenance Supervisor and that it was Rowland who was recommended for the position over

Moore and the others.  Def.'s Ex. 52.[8]  Moreover, Rowland acknowledged that Moore was a licensed contractor who had years of experience with a construction company he owned, whereas he did not have such a license and never owned a construction company.  Tr. at 446-47.

With respect to Cheeks, who was Rowland's predecessor as General Maintenance Supervisor, Rowland claims that Cheeks was compensated at a salary range of Grade 8 in the position whereas he was compensated at a salary range of Grade 7 when he obtained the position immediately after Cheeks retired.  He further claims that his white successor when he retired in 2002 was compensated at a salary range of Grade 9.  Tr. at 840.  The record shows, however, that at the time Cheeks retired in 1997, his pay range was Grade 7, which occurred while Cheeks was still in the position.  Tr. at 844; Def.'s Ex. 5, 7.  This change from Grade 8 to Grade 7, in any case, remained the same for Cheeks and Rowland in terms of salary (aside from seniority) as the step limits 41 to 85 for the position remained the same.  Tr. at 842-844; Def.'s Ex. 5, 7.  In this respect, Rowland acknowledged that the difference in the position of General Maintenance Supervisor being a Grade 8 and then Grade 7 is that the levels were simply renumbered before the 1995-96 school year.  Tr. at 456, 842.  As to the difference in pay between Rowland and Cheeks, Rowland acknowledges that Cheeks had many more years of experience in the district than he – ten to be exact – noting that Cheeks taught him whatever he knew.  Tr. at 447-48.  Finally, Rowland's position was upgraded to Grade 9 in 1999, not when he retired in 2002.  Tr. at 848-851, 913; Def.'s Ex. 75.  Again, however the level is not necessarily the defining fact as it is the minimum and maximum steps within the salary schedule that are determinative and were the same with respect to Cheeks and Rowland.  Tr. at 842, 848, 864, 869; Def.'s Ex. 5, 7.

---

[8] As previously noted, Rowland acknowledges that he has no firsthand knowledge of what happened in any discussions between anybody at the district and Moore.  Tr. at 446.

With respect to Mike Copeland, Rowland claims he supervised Copeland and yet Copeland was paid more. Tr. at 460.  He also claims he supervised a Larry Tyler and yet Tyler likewise was paid more than him.  Tr. at 461.  Rowland may have supervised Copeland and Tyler, but he acknowledges that Copeland had 14 more years of experience in the district than he while Tyler had 11 more years experience.  Tr. at 461.  It is not uncommon for individuals to make more than their supervisor due to seniority in that an individual moves three steps for each year of experience in the position and if an individual has been in the district 10 years, he or she would be 30 steps above the base level. Tr. at 859, 862.  *See also* Pl.s' Ex. 51 (noting, for example, that "experienced certified teachers may well be paid more than the assistant principals who supervise them").  In this respect, an individual at the top of, say, Grade 7 could be making more than an individual at the bottom of Grade 8.  Tr. at 862.  Rowland denied that this was common, was unaware of it ever happening, but offered no evidence in support of his position.

To the extent Rowland is comparing himself to Tom Camp, Electrical Systems Supervisor, and Calvin Brown, Mechanical Systems Supervisor, the General Maintenance Supervisor doesn't have a requirement for a professional license or a certification, as is required for the positions held by Camp and Brown, but is only required to have construction experience and a high school diploma or a GED.  Tr. at 465-66; Def.'s Ex. 60-62.

In sum, the individuals to whom Rowland compares himself had, among other things, more seniority (and experience in the case of Moore), and/or the positions they held required minimum qualifications that exceeded those required for Rowland's position  Rowland has not demonstrated that the district paid different wages to Moore, Cheeks, Copeland, Tyler, Camp and Brown for "equal work on jobs the performance of which requires equal skill, effort, and

responsibility, and which are performed under similar working conditions." *Tadme*, 328 F.3d at 989.

c.

Dobson states he is comparing himself to Kelly Sneed for purposes of his salary discrimination claim. Tr. at 17; Pl.s' PFFCL at 13-15.  As previously noted, Dobson was initially hired in September 1993 as a computer technician at Grade 5.  Def.'s Ex. 35; Tr. at 137-38. Similarly, Sneed was hired in November 1992, as a computer technician at the entry level of Grade 5.  Def.'s Ex. 34.  Dobson claims, however, that during the 1995-96 school year, Sneed received a promotion to that of Computer Network Technician and pay grade increase to grade 6 , the slated Grade for that position,  but that when Dobson  resigned in July 1997, he was still at pay Grade 4.  Pl.s' PFFCL at 15-16.[9]  The district acknowledges that Sneed was given an upgrade and that Sneed was ultimately paid $4,500 more than Dobson.  Tr. at 170-71, 1026; Def.'s Post-Trial Br. at 22.  The district argues, however, and this Court agrees, that it has presented legitimate, nondiscriminatory reasons for this difference in pay.

Sneed had been hired to report to the Director of MIS under the Business Affairs division whereas Dobson worked for the Instructional division.  Tr. at 78.  In this respect, Sneed didn't report to Dr. Altom or Dr. Bland as did Dobson but reported to Laura McBeth, and Dobson didn't move to the MIS division until May 1, 1997, shortly before he resigned from the district and some four years after Sneed had been in that division.  Tr. at 78, 90, 101; Def.'s Ex. 35.  Moreover,

---

[9] As previously noted, the salary range grades were renumbered before the 1995-96 school.  Tr. at 456, 842; Def.'s Ex. 6-8.  Accordingly, the Court assumes Dobson is taking this renumbering into account and equating the later Grade 4 with the earlier Grade 5 in effect upon his hiring when he claim's that he was "still" at Grade 4 upon his retirement.

Sneed's experience significantly exceeded that of Dobson.  Sneed graduated in 1977 from DeVry

Institute of Technology and, at the time of his hire, had some 14 years experience in the

mainframe and personal computers repair field and had been employed 13 years by Honeywell-

Bull in Houston, Texas as a computer service engineer.  Tr. at 167-68; Def.s' Ex. 34.  Dobson, in

contrast, had some four years of relevant computer experience at the time of his hire and received

his associate degree in engineering technology from the Arkansas College of Technology in 1985,

eight years after Sneed received his degree.  Pl.s' Ex. 23; Def.'s Ex. 33; Tr. at 26.[10]  Dobson

acknowledges that "after a time," Sneed had Novell experience and worked on the computers in

the district that were based on the Novell platform.  Tr. at 127-27.  Moreover, Dobson was unable

to compare his Novell experience with that of Sneed – particularly as it related to the Novell

platform, stating only that Sneed couldn't pronounce the word – as he and Sneed "didn't sit down

and take a test together."  Tr. 125-127, 142.   Dobson acknowledges that Sneed had more general

experience in the computer areas than he.  Tr. at 151.[11]

In sum, the individual to whom Dobson compares himself – Kelly Sneed – had more

seniority and experience than Dobson, and Dobson has not demonstrated that the district paid

different wages to Sneed for "equal work on jobs the performance of which requires equal skill,

effort, and responsibility, and which are performed under similar working conditions."  *Tadme*,

328 F.3d at 989.

---

[10] Dobson states he has computer experience dating back to 1983 and that he disclosed this information in his interviews but he acknowledges that this information is not included in his resume, asking, "Why would it be there?"  Tr. at 105, 120.

[11] It appears Sneed had more experience in Windows operating systems, on which the majority of the computers in the district operated (as well as DOS-based machines), while Dobson was more proficient in Apple or Macintosh operating systems (although he claimed the computers could operate on both and that it was "inaccurate" to state he was hired because of his experience with Apple computers).  Tr. at 127-128, 188, 1030.

2.

To the extent Dobson is claiming disparate treatment by comparing himself to Sneed in matters aside from pay, the Court finds that this claim also fails.  When asked whether Sneed "was treated differently, more favorably than [him] with respect to anything," Dobson did not refer to pay but replied, "More favorably than me with respect to the work environment, his work amenities in terms of his work area.  Kelly seemed to have resources when he needed them."  Tr. at 64.  He also stated that Sneed had to service far fewer computers than he, although he did not dispute, at least beyond his own testimony, that the computers he serviced were under warranty while Sneed's were not under warranty and required his own work.  Tr. at 123-25.  In addition, Dobson refers to his receiving training as did Sneed but that Sneed was not paged out of training sessions whereas his training sessions were frequently interrupted, thus leading to a disparity in training between himself and Sneed.  Tr. at 69, 120-21.

To establish a disparate treatment claim under Title VII (and 42 U.S.C. § 1981), a plaintiff must show that: (1) he is a member of a protected class; (2) he was meeting the legitimate expectations as to his duties; (3) he suffered an adverse employment action; and (4) circumstances give rise to an inference of discrimination as similarly situated employees, who were not members of the protected group, were treated differently.  *Gilooly v. Missouri Dept. of Health and Senior Services*, 421 F.3d 734, 738-39 (8th Cir. 2005).

The Court finds Dobson has not created a prima facie case of disparate treatment as Dobson's dissatisfaction with his work assignment and training does not, on this record, constitute a material change in employment necessary to prove an adverse employment action.  *See Tuggle v. Mangan*, 348 F.3d 714, 721-22 (8th Cir. 2003).  Moreover, Dobson has not

demonstrated that he and Sneed were similarly situated, as Sneed was in a different division until shortly before Dobson's retirement, reported to a different supervisor, and had significantly more experience than Dobson.

3.

The Court now turns to the failure-to-promote claim of Rowland. In order to establish a prima facie case in a failure-to-promote case, Rowland must show: (1) that he was a member of a protected group; (2) that he was qualified and applied for a promotion to an available position; (3) that he was rejected; and (4) that a similarly qualified employee, not part of a protected group, was promoted instead. *Rose-Mason v. NMR Hospitals, Inc.*, 133 F.3d 1104, 1109 (8th Cir. 1998) (citing *Shannon v. Ford Motor Co.*, 72 F.3d 678, 682 (8th Cir. 1996); *Lidge-Myrtil v. Deere & Co.*, 49 F.3d 1308, 1310 (8th Cir. 1995)).

Rowland's failure to promote claim fails for the simple reason that he received a promotion to the position he sought – that of General Maintenance Supervisor. Rowland does not dispute that he was interviewed and recommended for the position over Moore and the others, stating merely that he does not recall. Tr. at 445; Def.'s Ex. 52. Moreover, even though Moore was not hired for the position, Rowland, as previously noted, acknowledged that unlike himself, Moore was a licensed contractor who had years of experience with a construction company he owned. Tr. at 446-47. Rowland simply has not demonstrated a prima facie case of failure to promote.

4.

21

The Court now turns to the failure-to-promote and constructive discharge claims of

Dobson.

a.

At the conclusion of plaintiffs' case, the district moved for a directed verdict on all claims.

This Court granted the district's motion with respect to Dobson's failure-to-promote claim,

concluding that Dobson failed to establish a prima facie case for such a claim.  As previously

noted, in order to establish a prima facie case in a failure-to-promote case, a plaintiff must show:

(1) that he was a member of a protected group; (2) that he was qualified and applied for a

promotion to an available position; (3) that he was rejected; and (4) that a similarly qualified

employee, not part of a protected group, was promoted instead.  *Rose-Mason*, 133 F.3d at 1109

(citations omitted).  As stated from the bench in ruling on the district's motion to dismiss, this

Court concludes that the district did not discriminate against Dobson by failing to promote him to

the position of Assistant Director of Technology Suppor, as the evidence at trial established that

Dobson was not specifically considered for the position for which he applied (on June 11, 1997)

as he earlier terminated his employment with the district and did not engage in the interview

process.  In addition, the person who was selected, Jimmy Hogg, was significantly more qualified

for the position.  In this respect, Dobson has not shown that a similarly qualified employee, not

part of a protected group, was promoted instead.   For these reasons, Dobson failed to establish

the elements of a prima facie case of failure-to-promote and the Court therefore dismissed this

claim at the conclusion of plaintiffs' case.  Tr. 645, 648.

b.

The Court now turns to Dobson's constructive discharge claim.  In order to establish a constructive discharge claim, Dobson must show more than just a Title VII (or § 1981) violation by his employer.  *Phillips v. Taco Bell Corp.*, 156 F.3d 884, 890 (8th Cir. 1998).  Constructive discharge occurs when an employer deliberately renders the employee's working conditions intolerable and thus forces him to quit his job.  *Id.*  The employer's actions must have been intended to force the employee to quit, meaning the employee's resignation must be a reasonable foreseeable consequence of the employer's discriminatory actions.  *Id.*  In addition, to prove that he was constructively discharged, a plaintiff must demonstrate, based on an objective standard, that a reasonable person would find the working conditions intolerable.  *Id.*  "'The conduct complained of must have been severe or pervasive enough to create an objectively hostile or abusive work environment, and additionally the plaintiff must subjectively perceive the environment to be abusive.'"  *Tadlock v. Powell*, 291 F.3d 541, 547 (8th Cir. 2002) (quoting *Johnson v. Runyon*, 137 F.3d 1081, 1083 (8th Cir.), *cert. denied*, 525 U.S. 916 (1998)).  However, an employee who quits without giving the employer a reasonable chance to work out a problem has not been constructively discharged.  *Phillips*, 156 F.3d at 890.

The Court finds nothing in the record to suggest that the district deliberately rendered Dobson's working conditions intolerable and were intended to force him to quit or that the district at least could have reasonably foreseen that Dobson would resign as a consequence of his working conditions.  Dobson acknowledged that his wasn't the only office in the Pulaski East complex, that the Special Education division and the Federal Programs division were located in the complex and that there were white and black employees in both of these offices.  Tr. at 93.

23

Dobson further acknowledged that Food Processing and Bakery, the Security division, the Plant

Planning division, and the Pulaski County Sheriff's Department were located in the complex, and

he did not dispute that the Sheriff's Department was actually using his office.  Tr. at 94.  Dobson

does not dispute that others in the Pulaski East Complex complained of the heating and cooling,

the hogs, and drainage (although he states, without specifying the time, that there was no standing

water in front of Holder's office,  Tr. at 116), and he has not presented anything to suggest that

the snakes were other than two isolated incidents.  Tr. at 38.  Dobson intimated that he should

have had an office in the Instructional Division at the central office, but he doesn't know why he

wasn't given such an office and he does not specifically dispute that the space there was crowded

and that Dr. Altom and Dr. Bland didn't think there was enough space there for Dobson to do his

work.  Tr. at 96, 98.  Moreover, Dobson continued to work in the district after he was transferred

from this office.  Although Dobson was indeed placed in the "smoke room" with its intense smell

of smoke following this transfer, this placement was due to a shortage of work space and not

based on any intent to force him to quit.  Tr. at 205.  In this respect, two white individuals that

followed Dobson,  Hal Winter and Mike Cothren, likewise were placed in the "smoke room" due

to space shortage.  Tr. at 205-206, 391, 1023.

Dobson also refers to profanity being used in his presence by Beverly Williams and Judy

Brady sometime in 1996 (he could not recall the month or day).  Dobson acknowledges, however,

that neither of these individuals called him names or used racial epithets in his presence; he states

they merely were upset about a situation and began cursing in his presence.  Tr. at 113-15.  While

Dobson may have been "really kind of irritated" at these isolated incidents, Tr. at 33,

"'[c]onstructive discharge requires considerably more proof than an unpleasant and

24

unprofessional environment.'"  *Duncan v. General Motors Corp.*, 300 F.3d 928, 936 (8th Cir.

2002) (quoting *Jones v. Fitzgerald*, 285 F.3d 705, 716 (8th Cir. 2002)), *cert. denied*, 538 U.S. 994

(2003).

     To the extent Dobson is claiming a hostile work environment as a result of the racial

epithet on his door, the Court finds that no such claim has been established.  Dobson states he

"experienced a hostile, racially charged work atmosphere in that in order to gain entry into his

building he was confronted with hostile racial language on the door of his office," this language

being something to the effect of "Nigger go away."  Pl.s' PFFCL at 17.  Dobson, however,

apparently did not know about this writing for several months until it was "brought it to [his]

attention,"  Tr. at 41, 109; Pl.s' Ex. 25, and the writing apparently was "some felt-tip writing that

was bleeding through the paint that was on the door," paint that had previously been applied over

the writing.  Tr. at 1124.  There is no evidence that this writing was specifically directed at

Dobson and he never made any written complaint about this writing until after he moved out of

the office.  Tr. at 110-11.  The door was subsequently painted over after Dobson revealed it.  Tr.

at 111.  The district, then, adequately responded to and remedied the situation, and this isolated

incident, while certainly regrettable, does not, on this record, constitute a racially driven hostile

work environment.  *Cf. Sallis v. University of Minnesota*, 408 F.3d 470, 477 n.7 (8th Cir. 2005)

(use of the term "nigger" and the phrase "damn Somalians" was not directed at plaintiff "and the

infrequency of the remarks did not create a hostile work environment").

     In sum, Dobson may have been dissatisfied with his work environment, but other

employees of the district (some of whom were white) were subjected to many of the same

conditions (with the exception of the racial epithet), and Dobson's dissatisfaction in any case is

not enough to establish a constructive discharge.  *Duncan*, 300 F.3d at 935 (an employee's

dissatisfaction with working conditions does not establish a constructive discharge) (citation

omitted).  Dobson simply has not shown that the district deliberately rendered his working

conditions intolerable and were intended to force him to quit or that the district at least could have

reasonably foreseen that Dobson would resign as a consequence of his working conditions.

### III.

For foregoing reasons, the Court hereby finds in favor of defendant, The Board of

Education of Pulaski County Special School District, and against plaintiffs, Michael Anderson,

Louis Richard Rowland, and Michael Dobson, on all claims.  Judgment will be entered

accordingly.

IT IS SO ORDERED this 2nd day of March, 2006.

/s/Susan Webber Wright

UNITED STATES DISTRICT JUDGE